IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 15-02312-TUC-CKJ(LAB) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| Jaciel Corral-Cinco, | ) | |
| Defendant. | ) | |

The District Court referred this case to the Magistrate Judge for a hearing on the defendant's motion to suppress evidence and statements. The defendant, Jaciel Corral-Cinco, argues that all evidence obtained as a result of his illegal stops on November 30, 2015 must be suppressed because he was stopped without reasonable suspicion and arrested without probable cause, in violation of his Fourth Amendment rights. (Doc. 25).

An evidentiary hearing was held on July 26 and 27, and August 12, 2016. United States Border Patrol (USBP) Agents Justin Sanders and Samuel Schultz, and the defendant, each testified. Government's Exhibits 1 through 5 and 8, and Defendant's

Exhibits 2 and 5 through 8, were admitted for purposes of this hearing only.1

**Charge:**

The defendant is charged in a two count indictment with conspiracy to possess with intent to distribute, and possession with intent to distribute, 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

**Motion to Suppress:**

The defendant argues that his Fourth Amendment rights were violated when he was stopped twice by police without reasonable suspicion, and ultimately arrested without probable cause, on November 30, 2015.  He asserts that any evidence obtained as a result of the illegal stops and arrest must be suppressed.

The Court concludes the initial seizure was a valid *Terry* stop.  After the defendant and his companion were released, they were stopped a second time based on reasonable suspicion.  This second stop ripened into an arrest based on probable cause.  The search of the defendant's pocket was a search incident to an arrest.  The defendant's statements were made after valid *Miranda* warnings, and subsequent to a lawful arrest.  The evidence should be admitted at trial.

**EVIDENCE:**

*Justin Sanders*

Justin Sanders is a USBP agent with seven years' experience. He has been stationed in Nogales, AZ during his seven-year tenure, working in various units.   Sanders testified that on 11/30/15 he was working in the community policing unit with USBP Agent Schultz.  Sanders received a call from Nogales Police Department dispatch advising him that a concerned citizen called regarding people hiding in the brush on the west side of Target Range Road and Industrial Park Avenue, about one mile north of the international

---

1 Government's Exhibit 8 consists of two DVDs which the Court reviewed in chambers after the hearing. The DVDs have limited value due to the grainy quality of the images.   No testimony was presented to explain what the DVDs depict. The Court was unable to identify specific people and had difficulty identifying locations and specific vehicles.

border. That is an area where interdiction of drugs and undocumented people is common. It is near a small cluster of buildings, small businesses and warehouses. Agent Sanders was given no description of the people, or information about the number of people seen.

Sanders testified that when he and Schultz arrived in the area of Industrial Park Avenue and Target Range Road in a marked Border Patrol vehicle, Sanders saw two people try to "hide" behind a brick pillar, out of the agents' view. That characterization is not entirely credible based on the agents' testimony that the men were taller than the pillar and were looking at the agents. The court concludes that the men were simply trying to make themselves look less conspicuous. Sanders testified that there were no other people near the businesses. Government's Exhibit 1 shows the area where the defendant and his companion were first seen by the agents.

Government's Exhibit 8 is a video taken of the opposite side of the building. It shows a fair amount of traffic, people coming and going from the daycare center, and a couple of pedestrians in the area. Apparently there were people in the general vicinity but not in the agents' immediate area.

Government's Exhibit 2 shows a warehouse with bay doors. The building is in an "L" shape. The bay doors are not visible from the street.

According to Sanders's testimony, the agents got out of their vehicle and identified themselves as USBP agents. Agent Schultz spoke to the defendant and his companion in Spanish. Both agents were in uniform and were armed. Sanders observed the two men look at each other before answering questions. They were fidgety, shuffling their feet, and making no eye contact. In Agent Sanders's experience, some people legally in the country are nervous and fidgety when they have contact with border patrol agents. Sanders identified the defendant in court as one of the men.

The men each provided a B1/B2 visa when asked if they were in the United States (U.S.) legally. That type of visa does not allow the holder to work in the U.S. Nevertheless, the

men said they were looking for work. The defendant, however, said he did not know what kind of work he was looking for. In Agent Sanders's experience, people looking for work usually know the names of the companies where they plan to look for work. The agents spoke in friendly voices. The encounter lasted about two minutes, and then Sanders returned the visas and told the men they were free to leave. The men walked south on Industrial Park Avenue, toward the border. The two agents went in separate directions.

Agent Sanders suspected the men of scouting for drug or alien smugglers, although he never saw them communicating with anyone else. He walked to the east side of the building by the bay doors of the warehouse because he had found illegal aliens hiding there in the past. Sanders approached a white pickup truck, depicted in Government's Exhibit 3, parked with its bed against the warehouse door. He smelled the odor of marijuana coming from the bed. Sanders lifted the cover and saw bundles of marijuana. He removed the bundles and searched the cab. The marijuana-laden truck was discovered about 100 feet and a one minute walk from where the defendant was first contacted. Sanders notified Agent Schultz of his discovery by radio and asked Schultz to re-contact the defendant and his companion.

Schultz re-contacted the men about five to seven minutes after the first encounter. He transported both men back to the pickup truck in the back seat of his Tahoe, which has a secured metal cage. When Sanders approached the Tahoe, the men were out of the vehicle, one on each side. He can't remember if they were handcuffed.

Other agents arrived on scene before Agent Schultz returned. Agent Sanders witnessed Agent Schultz read the defendant his *Miranda* rights. The statement that followed was not recorded. The defendant took a key out of his pocket and gave it to Schultz, who gave it to Sanders, who started the truck with it.

Agent Sanders testified he originally made contact with the defendant because of recent smuggling trends in the area, the call from dispatch, the men's nervous and evasive

behavior, and because there was no one else in the area. He does not remember if the defendant had a cell phone. He did not see the defendant communicating with anyone by phone.

*Samuel Schultz*

Samuel Schultz has been a Border Patrol agent for ten years at the Nogales Border Patrol station. During that time he has written about ten to twenty investigative reports. He never received any training in report writing. Agent Schultz is fluent in Spanish. He testified that on 11/30/15 he was working in the community policing unit, on the west side of the DeConcini Port of Entry near the international border. Schultz was patrolling in uniform, in a marked Chevy Tahoe. He was working with USBP Agent Sanders.

At about 7:00 a.m. or 7:30 a.m. Agent Schultz received a radio call from dispatch regarding sensor activity in the brush on the west side of Industrial Park Avenue, near Target Range Road. There are interdictions of drugs or undocumented aliens in that area, as depicted in Government's Exhibit 4, every month or two. In his experience, scouts are placed in that area before loads of drugs or undocumented people arrive. The scouts are usually on cell phones. When the agents received the call from dispatch, they went to the area and walked in the wash and through the trees, but they didn't encounter anyone. Half an hour later, there was more sensor activity. Ten minutes later, dispatch advised the agents that a daycare center in the area received a call about people hiding in the brush nearby.

The agents responded and saw two people near Bustamante Refrigeration. They were not talking on cell phones. Agent Schultz testified that they were the only people in the area.

When the agents arrived, he saw two people walk behind the little pillar on the right of the photograph in Exhibit 1 and position themselves behind a white wall that Schultz estimates is 5 to 6 feet tall. Agent Schultz couldn't remember how visible the men were

once behind the wall, but they appeared to hide when the agents approached. Agent Schultz found that suspicious.

The agents approached the two men and identified themselves as USBP agents. Agent Schultz determined that the men spoke Spanish and asked if they were U.S. citizens. They responded that they were not. When Schultz asked for identification, each man presented a B1/B2 visa. They said they were here to work, but they did not know what type of work they were looking for. They said they were not looking for work at Bustamante's. Agent Schultz spoke in a normal tone of voice. He stood about four to five feet from the men.

Schultz testified that a B1/B2 visa does not confer work rights. It is for visitors and travelers. During this encounter, the defendant's companion, Mr. Quijada-Quijada, was fidgety and avoided eye contact. The defendant smiled and avoided eye contact but was relaxed and seemed to be amused by the encounter. The conversation lasted two to three minutes, and then the men were told they were free to leave. Schultz identified the defendant in the courtroom. He admitted that the details of the contact with the defendant, which occurred nearly eight months ago, are not documented in his report. He testified that he did not remember whether Corral-Cinco had a cell phone.

Agent Schultz told Agent Sanders that he suspected the men were scouts based on the visas, their answers to the questions, and their behavior. Scouts don't always use cell phones. They can use hand signals, mirrors, lights or radios to communicate, although there was no testimony that any of that occurred in this case. Sanders walked behind the warehouse. The men walked south towards the border, which is about one-half mile away or about one mile if travelling on the roads to the DeConcini Port of Entry. Schultz saw both men turn and look at him. One of the men then turned and looked again.

A couple minutes after the men walked away from the agents, Sanders called Schultz and told him to meet back near the warehouse because he had a white pickup truck loaded with drugs. He also asked Schultz to stop the men. Schultz got in his vehicle and drove

up next to the men. He got out of his vehicle and said he needed to ask them a few more questions because they found something. Schultz asked the men to get into his vehicle. He opened the door and the men got into the area with the metal cage, with doors that cannot be opened from the inside. Schultz shut the door. None of these details are in his report. Schultz testified that he did not place handcuffs on the men. He usually does not handcuff suspects or arrestees when transporting them, depending on the individuals.

   As he approached the men, Schultz called for more agents. Additional agents arrived as soon as the men were in the vehicle. Schultz drove the men for about 30 seconds and parked near the white truck. That was 100 to 200 feet from where the initial encounter occurred.

   Government's Exhibit 8 (camera 1) shows four USBP vehicles arriving behind the warehouse within less than two minutes of each other, with at least one of the vehicles using its emergency lights. A number of people get out of the vehicles and are seen walking around the area. Presumably they are agents. Within five minutes, a dark SUV also arrives. It is unclear if that is a law enforcement vehicle.

   Agent Schultz testified that he separated the men by placing Quijada-Quijada in another marked vehicle. The defendant remained in the back of the Tahoe with the door open and his legs outside the vehicle. He read the defendant his rights from a card in Spanish. Agent Sanders witnessed the advisal. Schultz then asked the defendant why he was in the area. He asked whether Corral-Cinco's response that he was there to work was the truth. The defendant shook his head "no." He admitted that he knew there was marijuana in the white truck and that he came from Mexico to transport the marijuana. The defendant said that he had the key to the truck in his pocket. He stated that Quijada-Quijada also knew about the marijuana and came from Mexico to transport it. Schultz took the defendant out of the Tahoe and handcuffed him behind his back. He conducted a pat down, removed the key from the defendant's pocket, and gave it to Sanders. Two to three minutes passed from

the time the defendant entered the Tahoe and when he was handcuffed. Schultz used no physical force, did not raise his voice and did not brandish his weapon during questioning.

*Jaciel Corral-Cinco*

Jaciel Corral-Cinco testified that he crossed into the United States on foot on 11/30/15 at maybe about 7:00 a.m. with his friend, Quijada. The men walked to Bustamante's and were standing by the door identified in Defendant's Exhibit 8, talking to a lady, when the agents arrived. Corral-Cinco doesn't remember the name of the lady and does not have her telephone number. She was an older lady. They spoke for three to five minutes about finding work. The lady told them she was not in charge and did not do the hiring. They were walking away when Corral-Cinco saw the agents approaching. They continued walking until the agents told them to stop. They did not try to hide.

The men were asked for their documents, which they gave to the agents. The agents asked Corral-Cinco to remove all his belongings, advising him that he was going to be searched. He took his wallet, cell phone, and cigarettes out of his pockets but did not turn over the key to the truck because he forgot. The agent searched all his pockets, including his sweater pocket where the key was, but did not remove the key. The testimony about being asked to remove all belongings and being searched during the first encounter is not credible. A search would have revealed the key in Mr. Corral-Cinco's pocket. It is not credible that Corral-Cinco forgot about the key which he likely knew was linked to a truck involved in criminal activity. Corral-Cinco testified he had no plan to drive the truck, but he received the key before entering the United States. He testified that he spoke with a woman about work, but his possession of the key indicates that he was not in the United States seeking legitimate work.

The agents asked what the men were doing there. Corral-Cinco's friend answered. The agents told the men to retrieve their belongings and that they were free to leave. Corral-Cinco testified that he made eye contact and was not nervous. The encounter was

brief. Corral-Cinco and Quijada left the area because Corral-Cinco was intimidated and thought he couldn't be there because of the agent's harsh tone of voice. Also, he didn't see other places nearby to look for work.

The men walked for about five minutes when the USBP car made a u-turn and stopped next to them. The agent got out of the vehicle, told the men to sit on the ground and handcuffed them once they were on the ground. That testimony is not credible in light of Agent Schultz's testimony that he removed Corral-Cinco from the car so he could handcuff him from behind as he stood facing the vehicle, once they arrived back at the warehouse.

Corral-Cinco testified that another car arrived and two or three more agents arrived on foot. Corral-Cinco was told to get up and get in the first agent's car. His friend was told to get into another car. The men were driven to an area where there were several cars and officers waiting near a white truck with marijuana bundles. Corral-Cinco was left in the car. The agents walked around and then returned and told Corral-Cinco to get out of the car. He was still in handcuffs. They searched him again and took the key, which was given to another agent who used it to start the truck. The agents removed all his other belongings, threw them on the ground and placed Corral-Cinco back in the Tahoe. They read him his rights, which he understood.

Corral-Cinco denies being questioned or making any statements. He doesn't remember being asked if he had the key to the truck or if he knew about the truck. He did not try to hide when the agents arrived. He did not look back at the agent after he was free to leave.

**DISCUSSION**:

The Initial Encounter

The defendant argues that he was stopped and questioned by police without reasonable suspicion, in violation of his Fourth Amendment rights. The government characterizes the initial contact as a consensual encounter lasting only a couple of minutes, in a public

place, free from threats or force, during which the defendant was free to leave and gave voluntary answers to questions. The Court disagrees with both parties.

The stop here is properly characterized as an initial inquiry followed by a brief investigatory detention. To justify an initial inquiry and a brief investigatory detention, there must be reasonable suspicion that criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30 88 S.Ct. 1868, 1884 (1968). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and is less demanding than probable cause. *United States v. Sokolow*, 490 U.S. 1, 6, 109 S.Ct. 1581, 1585 (1989) (citations omitted). Yet, it is also more than an inchoate and unparticularized suspicion or mere hunch, and requires that the officer articulate facts supporting his suspicion. *Id*.

USBP Agents Sanders and Schultz were investigating a report of individuals hiding in the brush near a preschool, less than a mile from the border, in an area known for drug and human trafficking. They were told that there was sensor activity in that area. They responded and found the defendant and his companion, who walked away when the agents arrived. No one else was in the area near the warehouse.

The agents told the men to stop. They questioned the men, who provided answers that the agents found suspicious. The defendant's companion was fidgety and nervous. The agents took their immigration documents, holding them until the men were free to leave. Prior to being told they were free to leave, a reasonable person would not feel free "to disregard the police and go about his business." *California v. Hodari D*., 499 U.S. 621, 628 (1991). The encounter was not voluntary. It was a brief, investigatory detention based on reasonable suspicion. The initial stop was lawful.

<u>The Second Encounter</u>

The government states that the second stop was either a *Terry* stop, justified by reasonable suspicion, or a lawful arrest supported by probable cause. The defendant argues that there was neither reasonable suspicion nor probable cause to stop the defendant

a second time. The Court finds that the stop was a *Terry* stop, and was based on reasonable suspicion. *See Terry* and *Sokolow, supra.* Only after the defendant was transported back to the warehouse and handcuffed was he under arrest.

The Fourth Amendment protects people against unreasonable searches and seizures and requires probable cause to support a warrantless arrest. *Maryland v. Pringle*, 540 U.S. 366, 369-70, 124 S.Ct. 795, 799 (2003). Probable cause is based on the totality of the circumstances and exists when a reasonably cautious person could conclude that there is a fair probability that a specific person committed a crime. *U.S. v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2001), *cert. denied*, 127 S.Ct. 358 (2006). The standard for probable cause is not terribly demanding. U.S. v. Collins, 427 F.3d 688, 691 (9th Cir. 2005). Examining the totality of the circumstances requires a two-prong analysis. The Court must determine the intrusiveness of the stop from the defendant's perspective, and the justification for the officer's conduct from the law enforcement point of view. *U.S. v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).

The Court in *Edwards* explains that in analyzing the first prong, the level of intrusiveness, the court must determine whether a reasonable, innocent person would feel free to leave after some brief questions under the circumstances under review. The basis for the second prong is that an officer should not have to fear for his safety during an investigation. It compels the court to decide whether there was a sufficient basis to justify an officer's safety concerns and the level of intrusion employed to allay those fears. *Id*.

In the present case, the defendant was stopped on the side of the road, walking south toward the border. Agent Schultz told him and his companion that he had a few more questions because they found something. He asked the men to get into the back seat of the Tahoe. The men complied. They were not handcuffed. They got into the locked, caged area together. They were transported for 30 seconds. A reasonable, innocent person would believe he was going to be questioned briefly about whatever the agents

found in the area where the first encounter took place, and would then be free to leave, as had just occurred minutes earlier. The intrusiveness of the stop, the first prong, favors a finding that the defendant was not under arrest at that time.

Agent Schultz did not testify that he was in fear for his safety when he re-contacted the two men. He called for backup as he approached the men, presumably because there were two of them and only one agent. Multiple agents arrived at his location once the men were secured in the back of the Border Patrol vehicle. The reason Agent Schultz decided to secure and transport the men was because of the proximity to the border. He did not want the men to run across the border. The second prong is neutral.

The analysis then turns to whether probable cause was developed between the first encounter and the arrest. Once the defendant admitted that he was not in the area looking for work, and that he had the key to the marijuana-laden truck, there was probable cause to arrest him. Agent Sanders discovered the white pick-up truck loaded with marijuana about 100 to 200 feet, and a one minute walk, from where the defendant and his companion were originally encountered.

Based on the totality of the circumstances, a reasonably cautious person could conclude that there is a fair probability that Defendant Corral-Cinco committed a crime.

Any statements or evidence obtained as a result of the lawful arrest should be admitted at trial.

**RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court **DENY** the motion to suppress evidence. (Doc. 25)

Defense counsel may serve and file written objections within 14 days. If objections are not timely filed, the party's right to de novo review may be waived. No reply to objections shall be filed unless leave is granted from the District Court.

The Clerk of the Court is directed to send a copy of this Report and Recommendation to

all parties.

DATED this 6th day of September, 2016.

_Leslie A. Bowman_ (signature)
Leslie A. Bowman
United States Magistrate Judge